for the second district is now open. The Honorable Justice Susan F. Hutchinson presiding, along with Justices Anne B. Jorgensen and Joseph E. Burkett. The case is number 219-0793, People of the State of Illinois, Plaintiff Appellee v. Quentin N. Fisher, Defendant Appellant. Arguing for the Appellant, Paul DeLuca. Arguing for the Appellee, Richard S. London. Good morning, gentlemen. Good morning, Your Honor. Good morning, Judge. Mr. DeLuca, whenever you are ready, you may proceed. Okay, thank you. Good morning, Your Honors and Counsel. I have laid out or raised three issues I'd like to initially discuss because I think they overlap to a degree. The first two issues spend most of my argument on that, if I could. I think, quite simply, my argument on the first issue, which does overlap, I think, to the second issue, relates to it, to the identification of the defendant. So, of course, as everyone knows, the state has to prove their case, every element of their case, beyond a reasonable doubt, including the identity of the person in court as the person who is responsible for the crime. In this case, it was a bench trial, and the state called, it's interesting that the state called initially four witnesses who had direct contact with the person I'll describe in the ditch. It was a motorcycle accident. The motorcycle was about, I think the evidence showed, 10 or 15 feet, somewhere in that range or distance from where they found, were the individuals who came to found a male person laying, apparently, in a very critical condition. So, the state calls four witnesses who had ample time to view that person, to assist them by way of CPR, etc., to hold his head. None of those witnesses were asked in court to identify that person. The next individual that the state relies upon to a degree was a person by the name of Kevin Nodder, who actually knew my client, the appellant, Quentin Fisher. Mr. Nodder's testimony still was not clear, still was not proof beyond a reasonable doubt of the identity of the person in the ditch as the same person, ultimately, that wound up in the hospital. Mr. Nodder does acknowledge, or did acknowledge, that he knew him, that he saw him that morning at the beginning of this. It was a charity bike run with motorcycles. Unfortunately, they were drinking and that was the problem here, but he saw him, he saw the bike, a bike that he had not seen before, but he believed it was Mr. Fisher's bike. I don't think he had any other contact with him. Later on in the evening, several hours later, he responds to this accident and did indicate that the person he saw, he could not truly recognize as Quentin Fisher, the individual he knew, because of the facial abrasions, the face was swollen black and blue, and he just said, he looked horrible, I couldn't recognize him. And I think the judge made a comment that, well, maybe he wasn't forthcoming. Now, later on, and I will discuss it to a point, Mr. Nodder's, the state brought up through the deputy that Mr. Nodder identified him as the person as Quentin Fisher, but I believe that was improper hearsay, it was improper for that, for that evidence to come into court. So up to this point, the first five witnesses, we have no identification of the person in the ditch. Joe Clever, he's the flight nurse, he begins this, he begins the sequence here, or what begins to be a continual leading hearsay questions that are presented by the state. He indicates that he identifies Mr. Fisher by reviewing his wallet, the wallet was never introduced, no identification was introduced, I did object, because I believe that is hearsay to say, I looked at a wallet and the person was, you know, Quentin Fisher. And that information is then presented to Dr. Tatebe, and again, we have now with Dr. Tatebe, I think the state just out and out, you know, they just lead her directly, do you come to treat a patient by the name of Quentin Fisher with a date of birth? I think it's not only leading, it's hearsay without foundation. And in effect, that was a state's attorney testifying, let's get all that in at that point. And the doctor, of course, doesn't identify him. And by the way, Joe Clever makes no identification. The doctor indicates the protocol. And the protocol, she says, well, I'm not sure I really participated in determining who the patient was. But I understand she said, that's normally what we do. And the state lays a foundation for the blood to come in. I like to make it clear, I'm not challenging the blood, what I'm challenging with regard to the blood is, there was no proper identification of whose blood it was. Although a nurse, my understanding is a nurse doesn't have to testify. But up to that point, the only way the name Quentin Fisher even came up is through an improper question by the state. I'd also like to point out very quickly before I move on in my argument that the court, and at least two occasions prior to this, didn't directly rule on my hearsay objections. On one occasion, he said, well, just go ahead to the state. And on another occasion, he said, well, I'll consider this as the quality of the evidence. Appearing to me that he wasn't going to give it much weight, but in the end, I think he did give it a fair amount of weight. So up to Dr. Tatevi, you know, what six or seven witnesses, no one identifies my client as the same person who was in the ditch. Now, the last person that kind of identifies for the state is Deputy Danko. Deputy Danko is an interesting witness because he was there. He admits the person was in the ambulance. He had no contact with him. So he does not. And so the state has no one really identifying him as the person at the scene that, you know, was taken to the hospital. And Deputy Danko then is permitted to testify as to what Kevin Nodder said, that Kevin Nodder identified him as the person on the scene. If the state was going to put that in, they had to first lay the foundation with Kevin Nodder and say to him, well, Mr. Nodder, did you So that statement that did come in was improper with foundation. I think it's also hearsay. The certified plates, the certified registration comes in. I understand the law on that. However, I think you still have this missing link of who is this person? How do we link up the person to the person at the scene? So Deputy Danko then says quite simply, I saw him in the emergency room. I was there for five minutes. None of that, that is not put in his report. So the fact that he, and he admits it, I understand. He doesn't put in his report that he does a basic identification. He doesn't take photographs. He apparently doesn't go out and do any follow-up investigation in this regard and obtain a statement from my client. And the point I was that on a previous matter before the grand jury where apparently neither he nor with all due respect to the state were prepared because the state attorney led him into a series of questions about, did you have occasion to respond to a single car accident where the person was, you know, Point and Fisher was behind the wheel? Well, that's clearly not what happened here. And he said, yes. And he wasn't, there wasn't a single car accident where my client was behind the wheel. My client, when anybody found him, he was 15 feet from a motorcycle. And clearly the state attorney was referring to a car. I don't know why he said that. And Mr. Deputy Danko just going along with them. Yeah, it was a car. So I think he was impeached. He didn't remember his face being swollen. He didn't remember the number of bruises, et cetera. So I think that in conclusion on that issue, I don't think the state, I don't think his testimony, his identification is clear, credible with regard. I think I'm approaching 10 minutes. So with regard to the last issue of the sentencing, I just would rely upon the fact that the statute says blood, you know, the 90 day enhancement comes in with the blood alcohol level is defined under this particular section. So it's the blood alcohol is defined where the Illinois state police rules and regulations apply. They don't say in there specifically emergency room blood is, is permissible. And Mr. London raises an interesting point. Well, how could it not, how could it be admissible at trial, but not admissible in sentencing? I, and I thought about that and I can only say, well, it's not in the language. And I think the courts have to otherwise. And I can only not surmise, but I can only state that perhaps there's a feeling that a person's liberty, if you're going to take a person's liberty away, 90 days going to jail, we want a stricter, we want a stricter reliability with that blood result. So with that, I'll, I'll end my initial argument. Thank you. Thank you, counsel. Justice Jorgensen, do you have any questions? I do. Mr. DeLuca, can't we consider the totality of circumstantial evidence as it relates to identity? Yes, judge, you can. But my, why is it enough here? Sorry, I didn't mean to cut you off, but why isn't it enough here? Because a lot of the evidence that was presented, judge, was, I just think inadmissible hearsay. With all due respect to Judge Pomer, I think he, on at least two occasions, never really ruled on my objections. And, but, but you're right. Totality of the circumstances, circumstantial evidence, absolutely. And I see the train, you know, you can follow it. Well, here's what happened here. And here's where it concluded. But in between, we have, in my opinion, inadmissible evidence as part of the totality. That's, that's the problem, I think. And that would be, again, not to put words in your mouth, but basically the wallet, without introducing the documents, it's just pure hearsay as to what anything in a wallet said. Is that your point? I believe so. So he's saying, I looked at a wallet, the wallet was never introduced. So he looked at a document in the wallet, presumably the driver's license, but he doesn't even make that clear and relates that. I believe that would be hearsay. All right. So you mentioned Judge Pomer, it was a bench trial. Can we presume that in a bench trial, the court only considered competent evidence? And even though there might've been some sloppy rulings on hearsay, and I'll grant you, it was certainly not crystal clear what he, that he ruled on your objections. But can't we assume, or don't we have to assume that the court separated the competent from the non-competent evidence in making its rulings as opposed to a jury trial? Yes, I would agree with you generally. Right. The rule is the court can, however, the court can also, you know, make error. I think if we could point out that he was wrong and because in his ruling, he did consider, for example, the wallet. In fact, he even says regarding the wallet, well, if you don't have the wallet, I think he makes a reference to, we don't have that identification. He does. I think he considers the wallet to be important, but again, if he, if he makes an error in that termination, then it appears he didn't, you know, didn't take out the bad stuff and consider only the good stuff. I want to ask you a question about the issue with respect to sentencing. You did not file a post-trial motion. You were trial counsel, correct? Yes. And you did not file a post-trial motion on the, to reconsider sentence. Is that, that's my understanding. Is that correct? I don't think I did. I raised it as an issue. I think I believe it was raised in the judge. I, you know, judge, I apologize. I yeah, I wouldn't do it. I wouldn't have filed it in the post-trial your honor. I honestly, I don't recall right now. If I did, if I didn't, I didn't, but okay. Well, here's my question. If you haven't filed a motion to reconsider the sentence, can we consider your issue on appeal or has it been waived? That's an excellent point. Your honor. I suppose if I didn't file, if I didn't file it, quite honestly, I'm looking at the record, but I can't find. Well, answer me this. I mean, if you didn't ask to reconsider the sentence, is that the same thing as saying, look, this is just pure statutory construction. This has nothing to do with reconsidering the sentence. My client got the 90 days, which is appropriate. If the blood is Yes. Okay. Um, justice Hutchinson, those were my questions. Thank you. Thank you, judge. Thank you. Justice Jorgensen. Now, justice Burkett, do you have any questions? I do your honor. Thank you, justice. Mr. DeLuca, when Kevin Nader was asked at the scene, who the person was that was in the helicopter, why wouldn't his response be an excited utterance? You're talking about the statement to, uh, to deputy Danko. Yeah. I mean, it's a startling event, correct? Um, I, I would tend to agree the circumstances would be a startling event, but I, I don't think it was established by deputy Danko that Mr. Nader per se was, uh, I mean, I'm sure he was upset by the circumstances. I know one of the witnesses was very upset. One of the brumbles I think was actually crying in court, but, um, it, it, it could possibly be an excited utterance, but I don't think it was, it was a, it was a question. Uh, it was a question to him directly. Do you know that person in court or do you know that in the ditch rather? And he, he identified the person who had just been in the helicopter as Mr. Fisher, correct? Yes. According to deputy Danko, the trial court, we, we reviewed the trial court's decision on overruling any objection, uh, for abuse of discretion, correct? Yes. With regard to the sentencing issue, isn't the issue moved? Hasn't your client's verdict for 90 days? Uh, no. Um, as a result of the pandemic, he's actually, uh, the interesting thing is he's up this morning to determine when he's going back. So they, they suspended his sentence. He served about half of it. He was serving weekends. So he actually has, I think another, um, 10 weekends to serve with respect to the evidence is justice Jorgensen brought out. If we were to agree with you that there was not a sufficient identity identity proved, um, your client's judicial admissions at sentencing, uh, basic, basically, if we were to agree with you that based upon the trial court error in allowing him this hearsay testimony in the state did not meet the burden of proof, what would be the point of a remand when your client judicially admitted that he was involved in the accident, that it was him, uh, that he said, my life has changed with all of this at sentencing. What would be the point of a remand or a reversal? Well, I, I don't know that that would be admissible at a new trial. I suppose we'd have to brief it and argue it, but I, I would maintain that, that, that his statement was not otherwise. I'm sorry. The LMI Supreme court has ruled otherwise. That's a judicial admission. And it's important that trial counsel advise clients in making a statement in elocution, not to admit their guilt. Well, I suppose the question is, is it a direct admission then? And even if there is an admission doesn't have, there have to be some corroborating evidence of it. How about the letters, uh, that were received in his support, referring to the accident, uh, that his life had changed his mother and his friends talking about the impact the accident had on him and how he sobered up afterwards. What about, well, again, I would say again, you know, can the state independent of, you know, is the state going to call those witnesses? I don't know at trial what they're going to do. If you remanded, uh, I think it should be reversed, uh, quite honestly, not remanded for a new trial, but that's what I would be asking for. But, um, I think the state still has to establish independent of any admissions, um, more evidence to link them to the accident. Thank you, Mr. DeLuca. That's all I have. Thank you, judge. Thank you, justice Burkett. Um, I have a few questions, Mr. DeLuca. Yes. You said at least twice about when and if a proper identification took place in the courtroom. Is there any rule that identification, um, must occur at a specific time in a trial? No, judge, I agree. It does not. It could be at the end, just, just as they did here. No, I agree with that. Okay. Now there, I suppose the undertone here is that somebody else was on that or driving that motorcycle on the date in question. Is there any evidence that anybody else was in the vicinity? No judge. Um, I, and I respectfully, I don't know that I'm saying I I'm not, my argument isn't really that somebody else may have done it. I know there were some questions asked at trial. Um, my argument is the state still has the burden to prove the identity of the individual beyond a reasonable doubt. So I'm regardless of whether somebody else may have done it, I didn't really raise that issue. There was some hint of it possibly during some of the questions, you know, whether the cornfield was disturbed, was it a passenger or could a passenger sit on the bike, but I just maintain the state has to prove this element of identification beyond a reasonable doubt. But one of the, I think one of the witnesses who arrived before, um, the emergency help, then after they arrived, went out toward that cornfield, toward that area, didn't find anything. So we still have circumstances, don't we, of a person lying in the ditch and nobody else that they can find in the vicinity. Correct. Yes. Right. Okay. I agree. Let's talk about Mr. Nader a little bit. The trial court did say it, Mr. Nader was credible, but invasive. Isn't that true? I'm sorry, judge, you were breaking up a little. I'm sorry. Didn't the trial court say that Mr. Nader was credible, but he was somewhat invasive. He did. And Mr. Nader's main reason for not being able to make a specific identification, other than to officer Denko, which you say is hearsay, was that the person whose body was there when turned over, his face was bruised and bloodied. And he just couldn't identify the person. Oh, and swollen. Isn't that what he said? He did say that. Yes. Now let's go to officer Denko, Deputy Denko at the, at the hospital. Didn't he say, and now this is probably an hour, maybe longer after the accident, that there were abrasions, but did he mention swelling or bruising? He said he could not remember when I asked him that question. All right. But Dr. Tatabi did also indicate there were facial abrasions, but did not say, you know, his face was swollen. But, you know, one of the things that I think is significant, I mean, we have a pretty, we have a patient in critical care. There was some reference to possibly brain trauma. The patient, the, the person is thrown from a motorcycle face down onto a hard surface. I, I don't think it would be unreasonable that, or, you know, out of the spectrum that he would not have those types of injuries. You know, when he did arrive at the hospital. Well, I agree that I think everybody recognizes the abrasions, but Mr. Notter's specific reason for not being able to recognize him when he was holding his head so that someone else could do CPR was that his face was swollen and people are arriving at this scene almost, you know, immediately after the accident, Mr. Notter hears a crash. The, the other parties drive up shortly after that. How, how is something bruised or swollen in such a short time? Well, I, I can't answer that judge because I'm not a doctor, but I, I, I don't think it would be by the time Mr. Notter got there, it probably had been several minutes. And again, he was, he, he hit the surface. I would assume pretty hard if he's thrown from that motorcycle. That's it. It would have been nice if the detective took some photographs for the identification or did some follow-up, but he did not. Well, you know, you just said that the person laying in that bed, presumably your client laying in that bed, were, they were concerned about brain injury. He was, I believe, still unconscious. Is, is it appropriate protocol to violate somebody's illness with flash bulbs and things of that nature? Well, I think it would have been very, I don't think it would have been that invasive judge. If he took one picture for purposes of any proper identification or even conducted an interview several weeks later, I suppose we may not be here if that were properly done, but it wasn't. And again, that's where the state bears the burden of proof. They have to the investigation and they still have the burden to prove the identification. Okay. You've suggested that the state wasn't very well prepared and the officer probably wasn't listening or didn't want to interrupt when the state asked if there was a car that Denko had seen. And he said, yes. Well, shouldn't we be worried as well, if that's the that Mr. Notter first said he pulled up on the scene while other neutral, he pulled up on the scene and there were other people at that same scene at the time who said that he ran from a house or a subdivision or a house area. And then later he said he ran to the scene. What did he do? Did he arrive? Did he pull up on the scene? Was he on a horse? Was he in a car? Was he in a motorcycle or did he really run down to the scene? Well, I see your point, but I think with all due respect, I do think Deputy Denko, the comment that Deputy Denko was trying to say that the wheel, a wheel, I'm just referring to, you know, a vehicle's wheel. He was specifically asked, Judge, you know, did you arrive at the scene where a single car accident, where the defendant was behind the, Quentin Fisher was behind the wheel of a vehicle? And that's absolutely not what happened here. So I think it is distinguishable. I understand your point with regard to Mr. Notter, but I think with regard to the deputy, that particular part of his testimony relates to his, you know, his credibility and which I think is more important, honestly, than exactly how Mr. Notter got to that. You know, I thought it was clear that he ran there. That's my impression. Well, but the officer had an opportunity to explain either on direct examination or cross-examination what he meant about that didn't, about behind the wheel or on didn't he? He tried to explain, in my opinion, he, it was nonsensical. He was caught. And I don't know, again, even why the state certainly, you know, at that particular, they were, what they were doing, judges, seeking medical records at a grand jury before he was even indicted. And I don't know why he would have even been asked that question. It didn't make sense. But again, my point is he was just parroting back, yes, whatever you ask me, I'll say yes. And again, going back to the deputies, why wouldn't the deputy put in his report that he made an identification at the hospital? I think that's pretty important. He did not though. All right. Thank you very much, counsel. Do either of my colleagues have questions based upon mine? No, thank you. Judge, could I just indicate real quickly before I, I yield to Mr. London, I did, I think I did file response to Judge Jorgensen, Justice Jorgensen's question. I think I filed a motion prior to the sentencing, a specific motion not to impose the mandatory jail sentence. So anyway, just, I believe that will be in the record. All right. Thank you very much. Thank you, Justice. All right. Mr. London, you may proceed when you are ready. Thank you, Your Honor. May it please the court, counsel. Your Honor, I just want to very quickly front, which I believe with pursuant to a message I left with the clerk yesterday, and that I believe he has notified the court that there are two typos or Scrivener's errors contained in the people's and or defendant's brief. I did speak to Mr. DeLuca and he agreed that I should mention them. And that is with both his consent and approval. The first is that we referenced in the brief 625 ILCS 5 slash 11 501 C2B. C2B actually does not exist. That should have been D2B as the punishment section. And then in issue three, the people cite to 601 ILCS 511 dash 5014. That should of course be 625 not 601 ILCS. Apologize for those typos. Moving to issue one, Your Honor. Your Honors, the people definitively proved defendant guilty beyond a reasonable doubt of the offense of driving aggravated driving under the influence, both by direct and circumstantial evidence. Obviously, the most crucial was the fact that Officer Denko identified defendant in court as the individual that he saw at the hospital. The judge made a specific credibility determination and determined that the identification was positive and credible. That alone was sufficient to establish defendant's identification. The people agree that the identifications of the circumstantial evidence in this case were introduced first, but especially in a bench trial. But regardless, there is no need to go through a certain specific order. In addition to the distinct and positive and credible identification by Deputy Denko, the people established that defendant was the individual that crashed motorcycle. Everyone else at the scene was eliminated, meaning the witnesses that did not testify specifically that defendant was the individual that they saw said that everyone else at the scene except the witnesses that testified had already left. The title and registration was in defendant's name. The defendant was the person transported to the hospital. It was the person, he was the person whose blood was drawn during the regular course of treatment in an ER and defendant does not dispute that his blood alcohol content was well over the legal limit. There was a question asked and indeed relating to Mr. Nader. The trial judge specifically said that Mr. Nader was evasive. There was no corroboration of his testimony that the defendant's face was so swollen that it was unable to be identified, that was not corroborated by Deputy Denko, that was not corroborated by the ER doctor. The trial judge admittedly did not specifically say how he was going to address the identification in the wallet or the doctor's testimony, although the doctor again testified not as to the identity of the defendant directly as much as saying proper and correct hospital protocol was followed. But even though that was not done maybe as specifically as possible, this was a bench trial and we do assume that the judge considered only competent evidence for the appropriate reasons. Therefore, the people as they argued more specifically and at length in the people's brief suggest that there is no dispute as to defendant's ID. To the extent that there were questions relating to could more have been done. Theoretically, the only way to satisfy defendant's argument would be to keep potentially critically injured people at the scene and or conduct further investigation, whether it be photos or do we, do we, it's unclear, it appears that defendant was unconscious, but do we attempt to wake the defendant at the hospital to ask him his name? That would be neither ideal nor humane. We could be risking the lives of patients if we're to take the time and make sure that we, you know, try to further identify them either at the scene or at the hospital. That can't be what is contemplated by the statute. Since defendant did not really get into issue two, I will not do much more than rely on my brief other than say that for the same reasons as argued on issue one, defendant was identified for issue two. Further and more importantly, when standard procedures are followed in an ER setting, the results including the identification of the patient and assuring that the blood is drawn from a certain patient, which is part of the standard procedures and safety protocol as was testified to by the ER doctor are sufficient under the statute to establish the identification. Turning to issue three, in response to Judge Jorgensen's question, I do agree with counsel. Actually at C81, defendant did file a motion not to impose the 90-day sentence. I'm not sure whether that is directly a motion to reconsider sentence, but he did file a motion. As I said, it's contained at common law record page 81, and it was entitled the motion not to impose 90-day sentence. Regardless, in both people versus mass and people versus back cited in the people's brief, a section 11501.2 really doesn't apply here. Section 11-501.4 does. The difference between mass and the incident case is in mass, it was the credentials of the person who drew the blood. Defendant now argues that the definition of hospital blood must be followed or that hospital blood isn't defined. The section doesn't define blood, period. It doesn't define hospital blood, nor does it actually define non-hospital blood. It merely describes how blood is to be analyzed and addressed. As in people versus hall, also referenced in the people's brief, as was distinguished in mass, the evidence in this case is not controlled by police order tests at the state police crime lab. Certainly the Illinois State Police Administrative Code cited by defendant is not at issue here. Rather, the blood testing in this case was ordered in the regular course of providing ER treatment, was not at the request of law enforcement authorities. Section 501.285, which does not define blood, hospital or otherwise, merely states how to determine the blood alcohol content level, which is taking a calculation of the amount of grams of alcohol per 100 milliliters of blood. There is no dispute that was done in this case. In conjunction with 501.D2B, in order to determine whether defendant is legally intoxicated, the blood alcohol content in order to trigger the punishment at issue has to be greater than 0.16. That is definitely consistent with the report in this case. In response to Justice Burkett's question, not only was there an admission by defendant at sentencing, the people want to note that the prosecutor and the trial judge bent over backwards to make sure that the 90 day sentence did not need to be served consecutively. As counsel mentioned, it hasn't even been served due to COVID and due to the fact that they allowed the defendant to do weekends. The people and the trial judge took every step possible to make sure that the mandatory sentence had a minimal effect on his life and his ability to keep his job. This is not the case of an overbearing prosecutor or this is actually a case where the parties did the best they could to make sure that the defendant had an opportunity to correct himself, which indeed he admitted that he had started to get his life and act together. Finally, the reference to Officer Danko being, I don't recall the exact language, but exceptionally impeached or incredibly impeached. You're either impeached or you're not, but he was not impeached by the car versus vehicle or car versus motorcycle reference. He explained that the question that was asked was, is it a single car? Yes. But he explained that he thought that to mean, was it a single vehicle, i.e. was there a explained that he did not mean specifically that defendant was behind the wheel of a car versus behind the handlebars of a motorcycle. I suppose the tire could be considered a wheel, but I don't think that's what he meant. He explained that he was not just agreeing to that. It was a one vehicle accident. Mr. London, your time has expired. If you would please summarize and we will then proceed with questions. Very briefly for these reasons, this court should affirm both the conviction and sentence. Thank you very much. Justice Jorgensen, do you have any questions of Mr. London? Mr. London, are you saying that if a witness explains away a prior odd statement that that means they're not impeached? Not under all circumstances, of course not. I mean, depending on what the statement is and what the explanation is, I'm saying in this particular... So that becomes a decision for the finder of fact, not for the state, right? Well, correct. And the finder of fact here that he was not impeached, that he was credible. I thought the court was specific about Notter being credible. I'm sorry. I thought you were talking to Officer Danko. Yes. The finder of fact here said, well, Mr. Notter was basically credible, but I found he was very evasive relating to the identification of his friend. All right. And it is your position that the sentencing provision just applies generally to blood. Correct. And then it's up to interpretation as to whether or not the legislative intent was the higher standard under the state police regulations or a lower standard, if you will, for hospital blood. I'm saying kind of the opposite, that blood is not defined at all. The implication of defendant's argument is that hospital blood is not defined, but blood is. Blood is not defined anywhere, hospital or otherwise. This court has found, as had the Fourth District in Beck, that the 501.4 applies when it is not police requested and police lab defined. The interaction of the in 501.2 is the explanation of how we are supposed to assess the blood, which is, as I stated, the grams of alcohol per hundred milliliters of blood nowhere in either of the statutes doesn't describe blood or one blood is more or less reliable. This court in mass specifically says that 501.4 testing is reliable and is as acceptable as the other statutes. So your position is it should come in? Yes, definitely. Of course. All right. Justice Hutchinson, I have no other questions. Thank you. Thank you, Justice Jorgensen. Now, Justice Burkett, do you have any questions? Just very briefly, Mr. London, would you agree that the question I asked Mr. DeLuca and Mr. DeLuca acknowledged that Nader's statement might qualify as an excited utterance. Is there anything missing in terms of the foundation for an excited utterance? I don't believe so. I believe it's both an excited utterance and in essence, it could also, even though, again, because it was a bench trial, the people didn't recall Officer Danko. Officer Danko arguably could have been called in rebuttal. But no, I do believe that this was both an excited utterance and or rebuttal. And as I said, the trial judge specifically said, well, he was generally credible. He, Nader, was generally credible, but clearly evasive. At least the implication, and I don't recall the exact language, but at least the implication of the judge was that Nader did not want to identify his friend. But the record is clear that at least he stated, while his face was swollen, I couldn't be sure. I do disagree with counsel that Mr. Nader more specifically identified the bike. He said, that is defendant's bike. I saw it that morning. It was different than an old bike, but I saw him with it. That was his bike. That and the fact of what I can see, I'm kind of putting two and two together that that was the fact. Mr. London, the point is, there's no requirement. Is there that a witness who had, where there's an exception to the hearsay rule that applies, there's no requirement that the state call the witness's attention to that statement if it qualifies as a hearsay exception, correct? Correct. I agree completely. That's all I have. Thank you, Mr. London. Thank you. Well, my colleagues have done such a good job of asking questions. I will not at this time. Thank you, Mr. London, for your argument. And now we'll return to Mr. DeLuca. If you have any reply, you may do so at this time. Thank you, Justice. I do have just a few comments. The fact that the court found Mr. Nodder to be credible, but apparently somewhat evasive, doesn't translate into a positive identification, nonetheless. I don't think the court can consider that in spite of the implication by the judge he's covering for his friend, that still isn't a positive identification. If he had described clothing, he wore this clothing in the morning. We have none of that in this case. And again, I understand the argument of the court being competent disregarding bad evidence, but I think the court did consider the wallet is what starts this whole chain of hearsay responses and leading questions by the the name Quentin Fisher and try to link the person in the ditch to the person at the hospital. It all begins with Joe Clever. In regards to the blood, I don't think that the court can say, in spite of the statute, the statute, as I read it, is pretty clear that under 11, the hospital, I'm sorry, under the sentencing provision, D2B, it says here pretty specifically that it's the blood, breath, other bodily substance or urine was 0.16 or more based on the definition of blood as defined in 11-501.2. It doesn't say, you know, before. And when you go to that section, that section says very clearly chemical analysis of the person's blood, urine, breath, or other bodily substance to be considered valid under the provision of the section shall have been performed according to the standards promulgated by the Department of State Police. So it is, as I think Justice Jorgensen said, it's the higher, it's a higher standard. You know, the hospital blood comes in very easily. And I think there were reasons for I understand, but hospital blood, you know, here's an example. Hospital blood does not come in under statutory suspension. Summary suspension urine can't be used there. So you can't just assume it can be used in this particular section to enhance it. It's not clear. I couldn't find any legislative intent on this, but again, I think a logical argument could be made that if they're the more reliable, the more stricter standard to apply. With regard finally to the excited utterance that Justice Burkett brought up, again, I just don't know that this qualifies per se as an excited utterance. He's on the scene. If he's asked a question, first of all, he doesn't say, you know, hey, that's my buddy in the ditch. That's my friend, Quentin, you know, it's in response to a question. No one testified to his emotional state. The detective or the deputy didn't say Mr. Fisher was crying, very upset. I just respectfully disagree that this is not an excited utterance. And I think it was a hearsay question. And that's all I have. All right, Justice Jorgensen, do you have anything you want to ask? Yeah, and the excited utterance just where you were talking about a second ago, you were referring to a lack of testimony about Nutter's state of mind at the time of the statement to the deputy, correct? Yes. Okay. And so no one talked about whether he was upset or he wasn't upset, right? I don't recall it being in the transcript. No. Okay. That was all I had. Thank you. Justice Burkett. Mr. DeLuca, it seems to me that you're asking us to reweigh the evidence. And with regard to the trial court's ruling, isn't it up to the trial court as to whether or not a foundation was laid for a statement by a witness, not us? Well, I understand the laws generally not to reweigh it, but I just don't think it was there, Judge Burkett. I'm asking you to look at the foundation of this and hearsay, the manner in which it came in. And I think with all due respect to Judge Pomer, he committed error there. I read the record and the transcript. Mr. Nutter said he came upon the accident scene, his buddy, his friend was laying there. The motorcycle that he thought was his was at the scene. And he told the deputy, that's Quentin Fisher in the helicopter. But that evidence, that evidence came in through, didn't come in through Mr. Nutter, it came in through the deputy. Well, excited utterances oftentimes come in through the police officer, like a woman who's been beaten. And then she refuses to testify a trial or recant her testimony. The police officer is the person that testifies, not the victim, correct? Yes, I agree with that. But what I'm saying is, I don't believe it qualifies as an excited utterance from Mr. Nutter to the deputy. It wasn't a spontaneous, it wasn't as if Mr. Nutter was the victim of a crime, saw something horrific. It's just that according to the deputy, do you know who the person is or something along those lines? But that evidence came in, I think improperly through deputy Danko. Mr. Nutter should have been asked by the state. Well, Mr. Nutter, didn't you say on when deputy Danko was there that the person in the ditch was, you know, Quentin Fisher. And then if he says no, now you perfect the impeachment. You have a case that stands for that proposition that you have to question the person who makes the statement or the declarant. That's the whole purpose of the hearsay exception. Well, I think to perfect, I think you have to give that person an opportunity to see if he made the statement or not, if you're going to put that statement in later. And I suppose if it comes in impeachment as impeachment evidence, it's not necessarily substantive evidence. I'm sorry. Do you have any authority for that proposition? Um, not right in front of me. No, but thank you. All right. Um, just a quick one from me, Mr. DeLuca. Didn't I mean your client or Mr. Nutter rather testified that he was holding the head. He didn't remember much. He was quite upset and he had just wiped vomit off of this person's face. While other people didn't testify maybe to his, his state of being at that point, didn't he testify to it himself when he testified before the bench? He did testify to that judge. Yes. Okay. And all of those things, although circumstantial can, I mean, circumstantial in terms of an excited utterance can be considered in that regard. Would you agree? Well, I'm not sure exactly when deputy Danko, it wasn't clear when deputy Danko asked that question. So it, it, it was within a relatively short period of time. I would agree. Okay. All right. Thank you very much. Do either of my colleagues have any question based upon my short one? I do not know your honor. Thank you. Justice Hutchinson. Thank you. Uh, counsel, thank you very much for your arguments this morning. This case will be taken under advisement and we will issue a decision in due course. Um, Mr. Kaplan, you may terminate this, uh, zoom and we will see you in about 10 minutes. Thank you, your honors. Thank you, your honors.